UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 25-CR-60015-DSL-1

UNITED STATES OF AMERICA, Miami, Florida

Plaintiff, February 10, 2025

vs.

CARLOS JOSE ABREU,

Defendant. Pages 1 to 27

---

DETENTION HEARING
BEFORE THE HONORABLE PATRICK M. HUNT
UNITED STATES MAGISTRATE JUDGE
(TRANSCRIPT OF DIGITAL AUDIO RECORDING)

APPEARANCES:

FOR THE GOVERNMENT: FELIPE PLECHAC-DIAZ, ESQ.
ASSISTANT UNITED STATES ATTORNEY
UNITED STATES ATTORNEY'S OFFICE
99 Northeast Fourth Street
Miami, Florida 33132

FOR THE DEFENDANT: WESLEY D. WALLACE, ESQ.
ASSISTANT FEDERAL PUBLIC DEFENDER
FEDERAL PUBLIC DEFENDER'S OFFICE
1 E. Broward Boulevard
Suite 1100
Ft. Lauderdale, Florida 33301

TRANSCRIBED BY:

PATRICIA DIAZ, FCRR, RPR, FPR
Official Court Reporter
United States District Court
400 North Miami Avenue
11th Floor
Miami, Florida 33128
(305) 523-5178

INDEX OF EXAMINATION


| WITNESS | Direct | Cross | Redirect |
|---|---|---|---|
| ANGEL GARCIA, JR. | | | |
| (Mr. Diaz) | 4 (Proffer) | | 18 |
| (Mr. Wallace) | | 9 | |

(PROCEEDINGS TRANSCRIBED FROM DIGITAL AUDIO RECORDING.)

COURTROOM DEPUTY: Recalling case 25-CR-60015, United States of America versus Carlos Jose Abreu.

Counsels, announce your name for the record, beginning with the government.

MR. PLECHAC-DIAZ: Yes, Your Honor.

Felipe Plechac-Diaz on behalf of the United States.

THE COURT: Good morning.

MR. WALLACE: Good morning, again, Your Honor. Wesley Wallace, from the Federal Public Defender's Office on behalf of Mr. Abreu.

THE COURT: Good morning.

Mr. Abreu, you have interpreting equipment now.

Are you getting Spanish interpretation?

THE DEFENDANT: Yes.

THE COURT: Can you hear me and understand everything with the interpretation?

THE DEFENDANT: Yes.

THE COURT: If at any time you don't understand what's going on, please let me know. We will try to take care of the problem.

Okay?

THE DEFENDANT: Okay.

THE COURT: Let me ask the interpreter to announce your appearance for the record.

THE INTERPRETER: Good morning, Judge, Maria Kisic.

THE COURT: Good morning.

Mr. Diaz, as you know, you may proceed by proffer, if you wish, as long as there is a knowledgeable agent available for cross-examination. If you do proceed by proffer, please let me know the specific basis for the request, whether there is a presumption, and if you know what kind of guidelines Mr. Abreu is looking at if he is convicted.

DIRECT PROFFER

MR. PLECHAC-DIAZ: Yes, Your Honor, we are proceeding by proffer. We do have a knowledgeable agent available, Agent Angel Garcia, Jr., who directly participated in the investigation.

With respect to the guidelines, I do not know what his guidelines are. The basis for detention is 18 U.S.C. Section 3142(f)2(A). The United States is seeking detention based on serious risk of flight.

THE COURT: Okay. All right. Go ahead with the proffer.

MR. PLECHAC-DIAZ: Yes, Your Honor. Before I proceed by proffer, I would ask the Court to take judicial of the Indictment, the Pretrial Services Report.

In addition, I would ask the Court to take notice of the factual proffer from Mr. Abreu's other case, 24-60155, and the detention offered from that case, the same case, 24-60155.

THE COURT: That was me. Right?

MR. PLECHAC-DIAZ: Yes, it was, Your Honor.

THE COURT: I will take judicial notice.

MR. PLECHAC-DIAZ: Okay.

Beginning with the government's proffer, the defendant's true name was Carlos Abreu. The defendant was born in the Dominican Republic. He entered the United States without inspection sometime in the early 2000s. Thereafter he settled in New Jersey, married a United States citizen. The defendant never obtained legal status in the United States or became a United States citizen.

In 2007, an arrest warrant was issued for the defendant in New Jersey for kidnapping, sexual assault, endangering a child and criminal restraint.

The arrest warrant was issued in his true name, Carlos Abreu. That arrest warrant is currently active and extraditable.

On September 7th, 2007, the defendant obtained a Florida drivers' license that bore the defendant's photograph but contained the biological information of C.R.V., including C.R.V.'s name and date of birth. C.R.V. is a United States citizen who resides in Puerto Rico. He has never -- C.R.V. has never traveled from Puerto Rico to the United States, does not know the defendant, and did not give the defendant permission to use his personal identifying information.

In 2013, the defendant's first wife applied for a U.S. passport for her minor child in common with the defendant. She submitted a statement with her application stating that the defendant fled their home on August 2nd, 2007, after being accused of assaulting a child. She also submitted court filing documents in her numerous attempts of unsuccessfully locating the defendant after he fled.

On October 2021, the defendant executed a U.S. passport application. The application was referred to the Diplomatic Security Service for further investigation.

In August 2024, the defendant was charged with three counts of passport fraud in violation of 18 U.S.C., Section 1542, and one count of aggravated identity theft in violation of 18 U.S.C. 1028(A).

On January 8th, 2025, the defendant plead guilty to the false statement charges, and as stated, he intends to proceed to trial on the aggravated identity theft charge.

When the defendant plead guilty, he signed a factual proffer wherein he admitted that his true name is Carlos Abreu, that he has never had legal status in the United States, and that he knowingly made false statements as to his identity on his passport application.

The investigation revealed that he use utilized the false identity of C.R.V. in multiple fraudulent ways. The defendant obtained a Florida drivers's license. He obtained a

driver's license in Pennsylvania using the same identity. The defendant married his second wife utilizing the assumed identity. The defendant petitioned for his second wife to become a legal permanent resident as the spouse of a United States citizen. The defendant applied for a PPP loan and obtained a Florida concealed weapon's permit.

The defendant also registered to vote and voted in Broward County, utilizing the assumed identity of C.R.V. records from the Supervisor of Elections revealed that in 2020, the defendant renewed his voter's registration in Broward County, Florida. The address, e-mail address, and the phone number utilized on the voter registration all match the information the defendant used on the fraudulent passport application.

According to voter records, the defendant voted in the November 2022 primary election. On August 22, 2024, the defendant was arrested in Broward County, and in a post-Miranda statement, the defendant initially was deceptive to law enforcement. He denied being Carlos Abreu and falsely claimed he was a United States citizen before admitting Carlos Abreu was, in fact, his true name. He admitted to registering to vote and voting in prior United States elections using the alias.

The defendant's residence was searched pursuant to a valid search warrant. During the search, four firearms were

located, three in a safe and one elsewhere in the residence. The defendant's wife was interviewed and she stated she did not have access to the safe. The defendant provided her with a passcode in the presence of officers. Inside the safe there were purchase receipts for two firearms showing that they were purchased by the defendant using the alias with a Florida driver's license in C.R.V.'s name with the defendant's picture. In addition, a Florida concealed permits weapon in C.R.V.'s name was found.

Additionally, Your Honor, the defendant also has an immigration detainer and Special Agent Angel Garcia, Jr. is available for cross-examination.

THE COURT: Agent Garcia.

Mr. Wallace, do you want to cross?

MR. WALLACE: Yes, please, Your Honor, briefly.

THE COURT: All right. Will the agent come up, please.

Come up here, please.

Agent Garcia, what agency are you with?

THE WITNESS: Diplomatic Security Services.

THE COURT: Diplomatics Services.

Are you special agent or some other title?

THE WITNESS: Special agent.

THE COURT: Did you hear the proffer?

THE WITNESS: Yes.

THE COURT: Was it accurate?

THE WITNESS: Yes.

THE COURT: Is there anything you'd like to add or correct?

THE WITNESS: (No verbal response).

THE COURT: You're prepared to adopt that as your direct testimony?

THE WITNESS: Yes.

THE COURT: All right. Have a seat. Make sure you speak into the microphone.

All right. Mr. Wallace, you may proceed.

CROSS-EXAMINATION

BY MR. WALLACE:

Q. Good morning, Agent Garcia.

Thank you for appearing today. How are you doing today?

A. Good. How are you doing?

Q. I'm doing good. Thank you for asking.

First off, what was your role in the investigation?

A. Yes, at the time of the investigation I was co-case agent --

Q. Okay.

A. And now primary case agent, so...

Q. I apologize, that first question wasn't clear.

When I say this investigation, I mean both cases, were you involved with both cases or just the initial 2024 case?

A. Both.

Q. So, you've been involved in that case since the inception of the 2024 case. Correct?
A. Yes.
Q. If you recall, can you give us an estimate of how long your agency was investigating Mr. Abreu prior to his arrest in August of 2024?
A. So, it was made -- once it was referred to Diplomatic Security Service, that's when we were involved, and the exact date I want to say it originated, off the top of my head, 2022.
Q. Okay. So, roughly about two years prior to his arrest, that's how long the investigation into him had been going on?
A. Yes.
Q. Okay. At the time that he was -- well, you are aware that there is a previous indictment from 2024. Correct?
A. Correct.
Q. Was your agency aware of the conduct in this current indictment at the time he was indicted in the first indictment?
A. At the time, no.
Q. So, at the time he was indicted in August of 2024, at that time your agency was completely unaware of anything related to the voting?
A. They were made aware once the search warrant was executed.
Q. So, prior to his actual arrest, you were aware of this -- of the allegations connected to the voting. Correct?
A. The search warrant revealed those.

Q. Okay. So, again, prior to the first indictment being filed?
A. Right.
Q. You were aware of the voting conduct?
A. Prior to the first one which resulted --
Q. Which happened after the search warrant?
A. Right.
Q. Correct. So, the search warrant happens?
A. Exactly.
Q. You find things. Later on we have an indictment.
A. Correct.
Q. So, question, before that first indictment is filed, you are aware of the information connected to the voting. Correct?
A. Correct.
Q. All right. So, my next question is, and I understand that you may not be able to say, I understand that, but do you know why the decision was made not to charge him for that conduct during the first indictment?
MR. PLECHAC-DIAZ: Objection, Your Honor. Asks for a legal conclusion.
THE COURT: Sustained.
I don't think it's his call. I think it's the prosecutor's call. You can ask him.
BY MR. WALLACE:
Q. Did you have any conversation with the prosecution of the

government about these voting charges at the time he was indicted on the first case?

MR. PLECHAC-DIAZ: Objection, Your Honor. Relevance.

THE COURT: I'm not sure that's the right ground, but it will be sustained on the same ground as before.

If you want to find out why, if you don't already know, talk to the prosecutor, but it's not this agent's call, I don't think.

MR. WALLACE: Understood, Your Honor.

BY MR. WALLACE:

Q. We heard on direct that your agency uncovered evidence to indicate that you believe Mr. Abreu registered to vote and voted. Correct?

A. Correct.

Q. And that evidence indicates in terms of when he actually submitted a ballot to vote.

Am I correct in saying that there is only evidence to show that he actually submitted a ballot in the 2022 election?

A. That is not the case.

Q. Okay. Which other elections, if you're aware of, has -- is there evidence showing that an actual ballot was submitted?

A. Off the top of my head there is at least one more record indicating, other than the one that you stated.

Q. Okay. Okay.

Do you know for sure which election that would have been

for?
A. They were certified by the Broward County Supervisor of Elections, so they will be within the concurrent judicial cycle, presumptively.
Q. Okay. Okay.
During your investigation, you were able to come up with a list of addresses that Mr. Abreu is believed to have lived at. Correct?
A. Correct.
Q. Were you able to determine when he began living in an address permanently in South Florida?
A. Yes.
Q. Do you recall when that was?
A. That was upon his initial application for a Florida driver's license where they must present proof of residence documents, in conjunction with receiving the license.
Q. Okay. Do you know when -- I understand that you need to submit that information in order to get a license, but do you know when he actually began living permanently in South Florida?
A. Off the top of my head, I'd have to refer to the notes.
Q. Okay. So -- okay. During your investigation, were you able to determine or did you come across any evidence to indicate that there are any other individuals in the United States living or using the same identifying information that

Mr. Abreu is accused to have used in this case?
A. There is only one, and that is the gentleman in Puerto Rico.
Q. I meant -- sorry -- any other individuals -- not the actual person corrected to, any other individuals using this identity in the United States?
A. No.
Q. The firearms that were found in the house, was an investigation forensic analyst, any sort of investigation done on those firearms?
A. Yes, we got trace reports from the ATFs.
Q. And any evidence to indicate that these firearms were used for illegal purpose or in connection with any other crime or anything like that?
A. Nothing to that.
Q. Anything to show that they were stolen or that the serial number was obliterated or that the firearms had been altered in any way?
A. No.
Q. Okay. The 2007 warrant from New Jersey, during your investigation did you across any evidence, any proof to indicate when or if Mr. Abreu was ever made aware of this warrant?
A. We interviewed his first spouse, his wife.
Q. Any evidence that Mr. Abreu -- no, I understand that you

indicated that you spoke to the wife and that she indicated that she was aware, but any evidence that directly showed that Mr. Abreu was made aware of the 2007 warrant?
A. From a law enforcement perspective, no.
Q. Okay. On direct, I also heard that there is an allegation of a PPP loan application. Do you know when that year -- excuse me, what year that was submitted?
A. I don't know that off the top of my head.
Q. Okay. And to be clear, Mr. Abreu is not charged with PPP loan fraud in the first or second indictment. Correct?
A. Correct.
Q. Okay. Were you present during the first arrest of Mr. Abreu in 2024?
A. Yes, I was.
Q. And as Mr. Plechac-Diaz indicated, at first he was not -- at first he was deceptive.
Aside from this initial deception, was he otherwise compliant and cooperative with the search?
A. He was.
Q. Did he try to flee in any way?
A. He did not.
Q. Did he eventually admit his true identity to you?
A. He did.
Q. Did he -- during his --
A. Can I clarify that? Not to me but to the interviewing

agent.
Q. Okay. Okay. And you heard him say this?
A. Yes.
Q. All right. During the interview, did Mr. Abreu make any statements regarding his belief regarding the identity of the personal identifying information that he was using?
A. I do not recall that.
Q. Specifically, did he make any statements regarding whether he knew that the ID was actually attached to a real person?
MR. PLECHAC-DIAZ: Objection, Your Honor. Relevance.
THE COURT: It's certainly relevant, I think to the first pending charge. That goes to the strength of the evidence and reason to flee.
MR. PLECHAC-DIAZ: It does, Your Honor.
THE COURT: Overruled.
Can you rephrase the question?
MR. WALLACE: Absolutely.
BY MR. WALLACE:
Q. During your interview, did Mr. Abreu make any statements regarding his belief about whether or not the identity he was using was actually connected to a real living person?
A. I can't comment on that, as I wasn't the primary interviewer on that, but not to my knowledge, no.
Q. Were you present during the entire interview?
A. Not in its entirety.

Q. What part were you present for? What parts were you not present for?
A. I was present for the initial portion, and then the interviewing agent began conducting the interview. And once the -- that was given and the authorization he offered us the safe number and fully complied with the search. Then we conducted the search while the interview took place.
Q. Did you make any notes during the interview?
A. I did not make any notes.
Q. Okay. Did you review the notes from any other agents or officers that did take notes during the interview?
A. I reviewed the case report.
Q. Did you review that case report in preparation for today's hearing?
A. Yes.
Q. And you don't recall seeing anything in there in regards to what statements he made to case agents during that interview?
A. I didn't see, yeah.
Q. Okay. And you don't recall any specific conversations or statements that Mr. Abreu made to the case agent in regards to his belief about whether the personal identifying information was connected to a real individual?
A. Off the top of my head I do not recall.
MR. WALLACE: Okay. No further questions at this time, Your Honor.

THE COURT: Thank you.
Any redirect?
MR. PLECHAC-DIAZ: Yeah, I just have one or two questions, Your Honor.

REDIRECT EXAMINATION

BY MR. PLECHAC-DIAZ:
Q. You mentioned with respect to your investigation related to the New Jersey warrant, you spoke to the defendant's ex-wife. What did she inform you of?
A. She informed me that she was co-owner with him of a duplex and that the tenant of their duplex called her in regards to the conduct of Mr. Abreu.
Q. And did she discuss what efforts she made to get in contact with the defendant after he fled?
A. She initially did make contact with him on the first call, and then after that she couldn't -- he wouldn't pick up the phone and, you know, she wasn't able to reach him at any time.
MR. PLECHAC-DIAZ: All right. Thank you.
THE COURT: Thank you. You may step down.
Any additional evidence or proffer from the government?
THE WITNESS: No, Your Honor.
THE COURT: Any additional evidence, testimony or proffer from the government?
MR. PLECHAC-DIAZ: No, Your Honor.
THE COURT: Any evidence, testimony or proffer from the

defendant, including letting me know whether the Pretrial Services Report is accurate to the extent that you can?

MR. WALLACE: No, Your Honor.

THE COURT: All right. Argument from the government?

You can step down, sir.

THE WITNESS: Thank you.

MR. PLECHAC-DIAZ: Yes, Your Honor.

The government has sufficiently established by clear and convincing evidence that the defendant is a serious risk of flight. This has been articulated in his first detention order. The defendant has been a fugitive from justice for approximately 17 years. You know, in order to evade the prosecution in New Jersey he abandoned his wife and child so that any argument of strong familial ties to a community do not apply to this defendant.

He obtained the personal identification documents of another person fraudulently and assumed that person's identity, including obtaining identification documents with his likeness and fraudulently accessing benefits of United States citizens.

Taking into all the factors of 3142(g), those factors support detention.

The nature of this offense is one of fraudulent, you know, use of ID and identities. The weight of the evidence is strong. The defendant admitted his identity. Voter registration documents were found in his home, along with the

firearms. His history and characteristics include lack of United States citizenship, which he admitted in his factual proffer. You know, his willingness and capability to leave his wife and child at the time in New Jersey, you know, to evade prosecution are applicable here.

You know, further, his removal from the United States based on his immigration detainer, you know, would lead that no condition or combination of conditions could reasonably assure the defendant be present at his trial following the disposition -- you know, the evidence is overwhelming that the defendant is not only willing to take extraordinary steps to evade prosecution, but he is also adept at doing so by evading the warrant out of New Jersey for approximately 17 years.

Finally, Your Honor, that this Court has already found him to be a serious risk of flight, and I would reiterate all the arguments from that detention hearing are applicable here, even more so with the additional charges that are now pending against the defendant.

THE COURT: The charges in the warrant in New Jersey are still active?

MR. PLECHAC-DIAZ: They are, Your Honor.

THE COURT: Okay. Argument from the defense?

MR. WALLACE: Yes, Your Honor.

Understanding that Your Honor has already held him with no bond in the previous case, I do still think that certain

arguments are worth pointing out to the Court.

First, Your Honor, is that the government has argued several times that Mr. Abreu has demonstrated an ability or willingness to flee to escape persecution. I'm assuming that they are referring to the 2007 New Jersey warrant. However, Your Honor, as the agent has testified, there is no evidence whatsoever to show that Mr. Abreu personally was aware of this 2007 warrant or that his move from New Jersey to Florida was in any way motivated by this 2007 warrant.

There also was not any evidence to indicate when exactly he moved from New Jersey to Florida or how that in any way is connected to the 2007 warrant.

In regards to his flight risk, Your Honor, I do think that although he is not a U.S. Citizen, the fact that he has been here for 20 years, he's clearly evidenced an intent to remain here, has worked here in South Florida specifically for over ten years with his wife. He has two children here, obviously, which are part of the conduct in terms of passport in the first case, but he does have strong ties to the Southern District of Florida, having lived here for over ten years, having a wife here, having two kids here, also having worked here all for over ten years.

I don't believe that these new charges in any way make it more likely that he is going to flee. I have done a guideline calculation for him. They do not inflate them much

higher, certainly not any higher than the mandatory minimum he is already looking at in the first case. Additionally, Your Honor, I don't believe there is any evidence or any argument really proffered as to his danger to the community.

He was cooperative with law enforcement, although deceptive at first, regarding his identity. He was cooperative with the search with law enforcement, with their arrest, and he was eventually forthcoming with who he was.

I understand, like I said, Your Honor, that he is being held no bond on another case, but I do feel that the Court could fashion reasonable conditions in this case should he resolve the first case in between so he can get his affairs in order before he has to resolve this most recent case.

I rest on those arguments, Your Honor.

THE COURT: What is his estimated guideline on the gun case?

MR. WALLACE: On the gun case, Your Honor, specifically just a gun case, he's 0 to 6.

THE COURT: On the gun case he is 0 to 6?

MR. WALLACE: Yes, Your Honor, he is 0 to 6 because he has, I believe, an eight-level reduction because the firearm is not -- it's used only for sport and for lawful purpose not connected with any other crime or bad conduct, essentially.

His guideline range on the false statement on the first case, Your Honor, is 0 to 6. He has a 24-month mandatory

minimum on the agg ID.

On the voting registration false claims, Your Honor, if he were to go -- if he were to take a plea and get acceptance of responsibility, his guideline range is 10 to 16.

If he goes to trial on those counts, does not get acceptance of responsibility, his guideline range is 12 to 18 months.

THE COURT: Okay. Thank you.

All right. I am going to grant the government's request for pretrial detention. There is no presumption in the case. The government is proceeding on serious risk of flight; therefore, I find that there is no evidence of danger to the community. However, I have already taken judicial notice of the previous order. I will adopt a reasoning in that order specifically that based on the nature and circumstances of the defense, the defendant's lack of status in the United States, his ties to a foreign country, presence of an active warrant for very serious criminal charges in another state, and the likelihood of removal from the United States following disposition of this matter, I find that he had little incentive to appear for trial and, therefore, presents a serious risk of flight.

The only thing different between then and now is he has now been convicted of some of the charges and certainly doesn't make it any better, and also he is facing new charges and

possibly new penalties.

I will also add -- I didn't specify in the previous one, but I also am considering his ability to operate under an alias. That makes it easier for him to avoid detection and that would go into the calculus as well.

So, for those reasons I find that he continues to be a serious risk of flight, and I will hold him in detention based on that.

Has he been arraigned on this?

MR. WALLACE: I believe he was, Your Honor, last week on Monday, if I'm not mistaken.

THE COURT: And I think there is a motion to consolidate.

MR. PLECHAC-DIAZ: There is a pending motion to consolidate, Your Honor.

MR. WALLACE: We're opposing that motion, Your Honor.

THE COURT: All right. Mr. Abreu, I am going to continue to hold you in detention. I don't think things have changed materially from the last time I saw you in the detention hearing, so I'm going to enter another order to that effect and order you in detention.

Anything else we need to do today in Mr. Abreu's case?

MR. PLECHAC-DIAZ: Your Honor, I was speaking with the agent. He doesn't believe that the arraignment happened on Monday.

THE COURT: Ruth doesn't believe it either.

MR. WALLACE: I apologize for misspeaking.

THE COURT: Are you ready to proceed with the arraignment?

MR. WALLACE: Yes, Your Honor. We have received a copy of the indictment. We have waived formal reading.

Mr. Abreu would plead not guilty to these charges at this time, reserve his right to a jury trial, and ask the Court to enter the standing Brady and discovery order if that has not already been entered at the initial appearance.

THE COURT: All right. The plea of not guilty and demand for jury trial being set and plea of not guilty and the demand for jury trial will be accepted and entered. I will sign the standing discovery order today.

Are you ready to do the Brady order, Ruth?

The Brady order has already been entered, so I will not re enter it.

Mr. Abreu, your case is assigned to Judge Dimitrouleas who sits here in Ft. Lauderdale. As things stand now your next appearance will be in front of Judge Dimitrouleas. My understanding is there has been a motion to consolidate with your other case. That will be up to the district judges involved whether to confirm that motion.

So you will either be appearing in this case in front of Judge Dimitrouleas or it will be rolled into your existing

case in front of Judge -- Leibowitz, is it?

MR. PLECHAC-DIAZ: Yes, Your Honor.

THE COURT: So, stay in touch with your lawyer. Your lawyer will let you know the status of this case.

Anything else we need to do, Mr. Plechac-Diaz?

MR. PLECHAC-DIAZ: No, Your Honor.

THE COURT: Mr. Wallace.

MR. WALLACE: No, Your Honor, thank you.

THE COURT: Mr. Abreu, do you understand everything that went on here today?

THE DEFENDANT: Yes.

THE COURT: All right. Good luck to you.

MR. PLECHAC-DIAZ: Thank you, Your Honor.

(Proceeding were concluded.)

C E R T I F I C A T E

I, Patricia Diaz, Registered Professional Reporter, in and for the United States District Court for the Southern District of Florida, do hereby certify that I transcribed from digital audio recording the proceedings had the 10th day of February, 2025, in the above-mentioned court; and that the foregoing transcript is a correct and complete transcript of said digital audio recording.

February 19, 2025
DATE

/s/Patricia Diaz
PATRICIA DIAZ, FCRR, RPR, FPR
Official Court Reporter
United States District Court
400 North Miami Avenue, 11th Floor
Miami, Florida 33128
(305) 523-5178